## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

### The Defendant and Related Individuals and Entities

1. Defendant Lissa Mel was hired to work for Yukom Communications ("Yukom"), an Israel-based business that provided sales and marketing services, including "retention services," for the for two internet-based businesses with the brand names, BinaryBook brand and BigOption. From in or around May 2015 until in or around July 2015, the Defendant received "training" in how to perform in the role of a sales representative at Yukom and worked as a sales representative on behalf of BigOption.

2. From in or around July 2015 through in or around November 2016, the Defendant worked as a sales representative on behalf of an Israel-based business called Numaris Communication ("Numaris"). Numaris was affiliated with Yukom and also used the brand name BinaryBook.

3. Lee Elbaz eventually became CEO of Yukom, and Elbaz used the alias "Lena Green" when interacting with investors. Elbaz supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and BigOption. In addition to Yukom, Elbaz trained and supervised representatives employed by Numaris who also performed retention work on behalf of BinaryBook.

4. BinaryBook and BigOption representatives sold and marketed financial instruments known as "binary options" to customers located throughout the world, including in the United States and within the District of Maryland.

### Background on Binary Options and Related Definitions

5. A "binary option" was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day. The option holder was typically promised that when the binary option expired, the option holder will receive either a pre-determined amount of cash or nothing.

6. A "conversion" representative was a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds.

7. A "retention" representative was responsible for working with the investor going forward with the goal of obtaining additional deposits. As part of this effort, the Defendant and other retention representatives were responsible for educating clients on how to use the BinaryBook and BigOption platforms.

8. A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

9. A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

### The Defendant's Participation in the Conspiracy and Fraudulent Scheme

10. The Defendant and other representatives of BinaryBook and BigOption, under the training and direction of Lee Elbaz and others, agreed to induce BinaryBook and BigOption investors to deposit funds based on material misrepresentations, including:

   i. false statements and material omissions regarding the alignment of financial incentives between investors and representatives—*i.e.*, claiming to represent the interests of investors when, in fact, they were not representing the interests of investors;

   ii. false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options;

   iii. false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors;

   iv. false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn; and

   v. false statements and material omissions regarding—and the deceptive use of—so-called "bonuses," "risk free trades," and "insured trades."

11. BinaryBook and Big Option representatives communicated with investors through the internet and communicated with clients by email and telephone. The calls with clients were recorded and used for training purposes. Lee Elbaz reviewed the calls and used the recordings to show BinaryBook and BigOption representatives successful sales techniques.

12. BinaryBook and BigOption representatives were not representing the interests of investors: When investors lost money, the owners of BinaryBook and BigOption profited.

13. BinaryBook and BigOption representatives falsely referred to themselves as "brokers" or "traders" to potential investors, when in fact they were sales representatives. In correspondence and other communications, the Defendant identified herself as a "Senior Broker," "Account Manager," *or* "Chief Analyst," ~~or "Expert Trader"~~ for BinaryBook.

14. The Defendant was assigned the alias "Monica Sanders" while working on behalf of BinaryBook. That alias was referred to internally as a "stage name" and approved by Lee Elbaz. The Defendant used the "Monica Sanders" alias to interact with investors at BinaryBook and falsely presented her location and professional qualifications to client investors.

15. On or about May 20, 2015, the Defendant circulated a call script to a co-conspirator, a BigOption representative, titled "Introduction" that was intended for use with investors ~~and that was, in fact, used by the Defendant with investors~~. The Defendant was not the author of the script. The script included the following false representations:

> I see here that your experience have not been so good so far, and I would like to help you change that, so first let me tell you a bit about myself, I'm 35 years old, I finished my economics at St. Petersburg State University, and since then I've been in the market for 12 years —4 years in Hsbc London and the rest I spent here at Big Options [sic].
>
> Before we begin I'd like to make one thing clear, I'm here for the long run. I'm not here to make you rich in one day or one week - I'm here to make sure that your financial future in trading is secure[.]

The Defendant was aware that other retention specialists used this call script and that, when they did so, they made false statements to investors about their background and qualifications. The Defendant made false representations to investors regarding her background that were similar to those contained in the call script.

16. BinaryBook representatives, including the Defendant, received an email instructing sales people to target retired people, social security recipients, pension holders, and veterans as clients, and they were trained on possible alternative funding sources for target clients located in the United States. For instance, representatives received an email about so-called "social security loans," being informed that a 60-year-old retired person could receive funds for investment by taking out a loan against social security benefits. Representatives were also instructed that U.S. customers could receive a tax refund in or around April which could be an additional source of funds; and were advised to induce investors to take out so-called "pay day loans" and, as to veterans in particular, that veterans were eligible for loans that are non-taxable that could be used for investment.

17. The Defendant had direct contact with investors and induced clients to invest in binary options by falsely representing the return on investment, making unauthorized deposits, and using "bonuses" to convince clients to continue to deposit funds. The Defendant also attempted to prevent investors from withdrawing funds from their accounts.

18. On or about May 4, 2016, the Defendant sent an email to a client investor representing herself as a "Chief Analyst-Executive Division" with the subject "Opportunity of a lifetime, Dream stock is back on !!!" and advertising specific returns on investments. Specifically, the email promised returns based upon the amount of money invested by "the end of the day today," e.g., an investment of "$5000" would provide a "return of $8750 by the end of the day;" and an investment of "$15,000" would provide a "return of $26,250 by the end of the day."

19. On or about June 14, 2016, Defendant attempted to make an unauthorized deposit of £3000 from a client investor's credit card. The Defendant informed the client that she would "help him by trading together" and asked for the limit on his credit card. When the client told the Defendant that he did not have the resources to add additional funds to the trading account, the Defendant told the client that she would give him a 50% bonus. The Defendant did not tell the client about the turnover requirement imposed by the bonus. The Defendant told the client to deposit £3000 from his credit card to continue trading. Although the client at first provided the CVV number for his credit card to the Defendant, he ultimately declined to authorize the deposit of £3000 from his credit card and instructed the Defendant "not to use the maximum on the card since he needs the money until next week." Nonetheless, the Defendant attempted to withdraw the £3000 from the client investor's credit card, but the transaction was declined by the bank. The Defendant told the client to contact the bank to gain authorization for the credit card transaction. The Defendant told the client that he should authorize a £500 deposit from his credit card, but the client did not agree to make that additional deposit. Without the client's authorization, the Defendant processed a £500 deposit from the client's credit card. After the client complained to his bank about this transaction, BinaryBook management ultimately processed a refund of the £500 to the client. The client at issue was not a resident of the United States and not located in the United States at the time of this transaction.

20. The Defendant was aware that BigOption and BinaryBook had investor clients in the United States. Although the majority of the Defendant's clients were not in the United States, on a small number of occasions during her employment with Numaris/BinaryBook, the Defendant was assigned clients who were based in the United States. The Defendant was aware of the location of her clients throughout the world.

21. In furtherance of the conspiracy, the Defendant communicated with more than ten investors and was directly responsible for approximately $288,024 in investor losses.

SO STIPULATED:

_____
Ankush Khardori, Trial Attorney
Tracee Plowell, Assistant Chief

_____
Lissa Mel
Defendant

_____
Jonathan Biran, Esq.
Counsel for Defendant